UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| CHRISTOPHER CARR, | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | |
| v. | ) | Civil No. 05-54-B-W |
| | ) | |
| JEFFREY MERRILL, | ) | |
| WARDEN, MAINE STATE PRISON, | ) | |
| | ) | |
| Respondent | ) | |

## RECOMMENDED DECISION ON 28 U.S.C. § 2254 PETITION

Christopher Carr has filed a 28 U.S.C. § 2254 petition challenging his convictions for attempted murder of his estranged wife Debbie Divens, Carr's son Denver, his father-in-law, and his mother-in-law. Carr admits that, at around 2:00 a.m. on July 28, 1995, he lit a Coleman-fuel-accelerated fire on the hood of his father-in-law's truck because he was upset by his father-in-law's intermeddling and about a report he had recently received from a guardian ad litem making recommendations about his son's custody arrangements. This truck was parked at the base of a set of stairs that led to a second-story porch attached to the second-story entrance to his wife's Brunswick, Maine apartment. Carr was charged for that offense and for attempted murder because Carr was responsible for an additional fire at the entranceway into the apartment. Carr's defense to these counts, which he first articulated in a statement to the police hours after the fire, was that while he intended to send Debbie's father a message by setting the fire on the hood of his truck, the fire that started in the doorway to the apartment was the unintended consequence of

his message-sending efforts.  According to Carr, as he was lighting the fire on the hood of the truck the Coleman can which he held in his gloved left hand "flashed" and, alarmed, Carr threw the flaming can up over his shoulder and it landed on the second floor deck where it ignited the doormat and the sides of the apartment door.

In this 28 U.S.C. § 2254 petition Carr resurrects the claims of ineffective assistance of counsel that were articulated to the state courts in Carr's post-conviction proceedings.  Carr faults his two trial attorneys for failing to do adequate pre-trial investigation and for not employing competent investigators and scientific experts in order to be prepared to meet the State's scientific evidence.  He also argues that counsel should have pursued a motion to suppress on the grounds that the several-month delay by the State in turning over their report to Carr resulted in the spoliation of the evidence apropos soil samples taken from the scene which contained, the State's expert testified, two different accelerants. Post-conviction counsel also argued that a spoliation argument should have been made regarding the release of the father-in-law's truck by the police making it unavailable for testing.  Carr further faults counsel for not objecting to the "continuous histrionics and unfounded statements of the prosecutor throughout the trial and during summation."  In a second 28 U.S.C. § 2254 ground Carr argues that his sentencing ran afoul of Blakely v. Washington, 542 U.S. __,124 S.Ct. 2531 (2004).

The state post-conviction court determined that, even if counsels' representation was deficient, it did not deprive Carr of a substantial ground of defense because any additional pre-trial investigation and possible expert testimony would not have changed the outcome of the trial as Carr made an educated decision to testify to his questionable theory of the case and that the failure to object was a defensible trial tactic.  After

thoroughly reviewing the state court trial and post-conviction record, I conclude that this conclusion was not contrary to or an unreasonable application of the <u>Strickland v. Washington</u>, 466 U.S. 668 (1984) prejudice prong.  With respect to Carr's second federal ground,  <u>Blakely</u> is not retroactive to cases on collateral review.  Accordingly, I recommend that the Court **DENY** Carr 28 U.S.C. § 2254 relief.

*Discussion*

*Parameters of 28 U.S.C. § 2254 Review*

In its answer to the petition the State of Maine concedes that the 28 U.S.C. § 2254 petition is timely filed, <u>see</u> 28 U.S.C. § 2244(d)(1), and that Carr adequately presented his ineffective assistance claims to the state post-conviction court and the Maine Law Court in an application to appeal the denial of post-conviction relief, <u>see</u> 28 U.S.C. § 2254(b)(1)(A); <u>compare</u> <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838 (1999).  Carr's second, <u>Blakely</u> premised § 2254 ground was not presented to the state courts and is procedurally defaulted, however this court can deny a claim on the merits notwithstanding such a failure to exhaust state remedies, <u>see</u> § 2254(b)(2).

My inquiry for purposes of Carr's § 2254 exhausted claims must focus in on this federal court's 28 U.S.C. § 2254(d) review of the state courts' adjudication of Carr's ineffective assistance of counsel claims. Subsection (d) of § 2254 provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> > **(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> > **(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

3

28 U.S.C. § 2254(d).

The First Circuit has discussed these review standards in the context of the Sixth Amendment inquiry for ineffective assistance of counsel, relying on the Supreme Court precedents of  Strickland v. Washington, 466 U.S. 668 (1984) and Williams v. Taylor, 529 U.S. 362 (2000):

> To demonstrate ineffective assistance of counsel in violation of the Sixth Amendment, [the § 2254 petitioner] must establish (1) that "counsel's representation fell below an objective standard of reasonableness," and (2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984); see also Scarpa v. DuBois, 38 F.3d 1, 8 (1st Cir.1994). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.
>
> To prevail on his habeas petition, however, [the § 2254 petitioner] must demonstrate not just that the Strickland standard for ineffective assistance of counsel was met, but also that the [state court's] adjudication of his constitutional claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  A state court decision is "contrary to" clearly established federal law if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," Williams v. Taylor, 529 U.S. 362, 405 (2000), or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different] result," id. at 406. A state court decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.
>
> The Supreme Court has made clear that "an unreasonable application of federal law is different from an incorrect application of federal law." Id. at 410. Therefore, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411; see also Hurtado v. Tucker, 245 F.3d 7, 15-16 (1st Cir.2001).

Mello v. DiPaulo, 295 F.3d 137, 142 43 (1st Cir. 2002); see also Bell v. Cone, 535 U.S. 685, 694 (2002) (undertaking the § 2254(d)(1)/ Strickland analysis); Stephens v. Hall, 294 F.3d 210, 217-23 (1st Cir. 2002) (same).

This court accords deferential § 2254 review even when the state court opinion(s) are brevis, see Norton v. Spencer, 351 F.3d 1, 5 -6 (1st Cir. 2003); see also Schaetzle v. Cockrell, 343 F.3d 440, 443 (5th Cir. 2003) ("Because a federal habeas court only reviews the reasonableness of the state court's ultimate decision, the AEDPA inquiry is not altered when, as in this case, state habeas relief is denied without an opinion."), and the state court need not cite or even be aware of the pertinent Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them," Early v. Packer, 537 U.S. 3, 8 (2002).

And because the post-conviction court held an evidentiary hearing on Carr's ineffective assistance claims, I must also be mindful of subsection (e) of § 2254, which counsels:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1); see also id. § 2254(e)(2).

### The State Court Adjudication of Carr's Ineffective Assistance Claims

The Maine Law Court having summarily denied Carr's certificate of probable cause, the decision subject to federal review is that of the post-conviction court.  As relevant to this federal petition, the court explained its reasons for denying Carr relief thusly:

Petitioner Carr argues that he was denied effective assistance of counsel because his counsel, Attorneys Bushell and Keaveney, did not initiate sufficient pretrial investigation.  More specifically, Plaintiff Carr asserts that competent defense attorneys, in preparing a case for trial, would have hired a capable arson investigator, chemist and private investigator, thereby properly preparing themselves to competently try the matter.
....

First it is necessary to determine if Attorneys Bushell and Keaveney's conduct fell measurably below that which might be expected from an ordinary fallible attorney.  More specifically, Petitioner Carr asserts that Attorneys Bushell and Keaveney's conduct did fall below this standard because[] they failed to perform adequate pre-trial investigation.

In this case, Petitioner Carr asserts that Attorneys Bushell and Keaveney failed to retain appropriate experts, including a competent arson investigator, chemist and investigator.  Moreover, Petitioner Carr argues that this conduct resulted in a failure to properly review and analyze evidence in the State's possession, which could have resulted in partial rebuttal of the State's case, which could have led to a better outcome at trial.

Although Petitioner Carr contends that the additional expertise of an arson investigator, chemist and investigator would have been useful, this court disagrees.  First, Henry Griffin, Petitioner Carr's previous attorney, retained David Dodge, an expert who investigated and took measurements of the crime scene.  (May 5, 2003 Transcript at 150.)  Based on his expertise and investigation, David Dodge informed Attorney Bushell that Petitioner Carr's story was implausible.  Id. at 147.  Consequently, Attorney Bushell determined that David Dodge's testimony would not be useful at trial.

(Post-Conviction Order at  2-3.)  In a footnote to this last paragraph, the court stated:

"Although Petitioner Carr argues in his brief that Mr. Dodge did not do an independent investigation, this court finds credible the testimony of Attorney Bushell at the May 5, 2003 evidentiary hearing."  (Id. at 3 n.1.)

The court continued:

Attorney Keaveney also consulted with a chemist to provide her with knowledge regarding the mass spectrometer and petroleum distillates.  (June 5, 2003, Transcript at 14.)  Attorneys Bushell and Keaveney, however, determined that the chemist's testimony was not particularly helpful because accelerants were used and the other scientific evidence was not the main focus of their defense.  (June 5, 2003, Transcript at 18-

19.)  Despite this determination, however, Attorney Keaveney adequately cross-examined Dr. James Young at trial regarding the testing he had performed.  (Trial Transcript III at 176.)

Additionally, Attorney Bushell hired a private investigator who interviewed Petitioner Carr's co-workers and people he was drinking with on the night of the fires to attempt to develop a mental abnormality defense.  (May 5, 2003 Transcript at 152-53.)

Petitioner Carr also argues, however, that Attorneys Bushell and Keaveney's pre-trial investigation failures led to them not filing the appropriate pre-trial motion to suppress and a motion to dismiss based on spoliation of evidence.  Despite this assertion, however, this court finds that the chemist Attorney Keaveney contacted indicated that the lack of evidence for testing was not unusual because medium petroleum distillates are very volatile and evaporate.  Id. at 15.  Accordingly, a motion to dismiss would have likely been denied.

Further, even if Attorney Bushell had filed Motions to Suppress in regard to the crime scene video, this court finds that there was still ample evidence at trial by the State indicating Petitioner Carr's guilt.  This evidence included[] Dr. James Young's testimony and Petitioner Carr's own testimony.

Petitioner Carr also asserts, however, that Attorney Bushell's failure to timely object to the Prosecutor's dramatics during trial and closing arguments, constituted performance which fell below that which can be expected from an ordinary fallible attorney.  This court disagrees.  While this court does not intend to comment on each statement made by the Prosecutor in this case, a review of the trial transcript reveals that Attorney Bushell's conduct was adequate.  This court is mindful that, in the context of this claim, it is often not a wise trial tactic for counsel to object to every possible objectionable statement made throughout the trial.  See Pierce [v. State], 463 A.2d [756,] 759 (Me. 1983) (holding that trial strategy involves professional judgment and accordingly the counsel making the tactical decisions is afforded great deference by the court.)

This court further notes that the record also reveals that Petitioner Carr was an extraordinarily difficult client to represent.  In fact, Attorney Bushell attempted to withdraw from this case[] because Petitioner Carr refused to focus on anything but his divorce.  (May 6, 2003 Evidentiary Hearing at 27-38; June 5, 2003 Evidentiary Hearing at 2-3.)  In addition, Petitioner Carr insisted on testifying at his trial, despite Attorney Bushell's urging to the contrary.  Accordingly, Attorneys Bushell and Keaveney's task was made more difficult by Petitioner's Carr's failure to cooperate.

Overall, due in part to Petitioner Carr's stubbornness regarding his testimony and the facts presented, Attorneys Bushell and Keaveney made several strategic and tactical decisions[] that this court will grant deference.  See Pierce, 463 A.2d at 759.  Hence, this court finds that Attorneys Bushell and Keaveney conducted a sufficient amount of pretrial investigation to support their trial strategy and tactics of "humanizing"

Petitioner Carr.  Although in "hindsight" this court may have done some things differently, it cannot now make a finding that Attorneys Bushell and Keaveney's conduct fell below that of [] ordinary fallible attorney[s]. Id.

Therefore, based on these findings, this court concludes that Petitioner Carr was not deprived of an otherwise substantial ground of defense.  See [State v.} Brewer, 1997 ME 177, ¶ 15, 699 A.2d [1139,]1143.  Even if this court were to find that Petitioner Carr's attorneys' conduct fell below that of an ordinary fallible attorney, it could not find that this conduct deprived him of a substantial ground of defense. For the reason that[] any additional pre-trial investigation and possible expert testimony would not have changed the outcome of the trial[] because Petitioner Carr made an educated decision to testify to his questionable theory of the case.

(Id. at 4-6.)

I need not funnel the court's performance analysis and related factual findings through the 28 U.S.C. § 2254(d) and (e)(1) prisms as the court's conclusion apropos the want of prejudice certainly survives § 2254(d) review.

### The 28 U.S.C. § 2254/ Strickland Prejudice Determination

Post-conviction counsel's argument at the evidentiary hearing and in the memorandum seeking the Maine Law Court's review that had counsel performed adequately apropos the pre-trial investigation and employment of a defense expert then Carr could have challenged the State's theory as to how and in what order Carr set the two fires.   It was the prosecution's theory that two flammable liquids were used and two different fires deliberately set.  (Trial Tr. Vol. II at 29.)[1]

### The Prosecution's Evidence

The evidence key to the prosecution's theory was the State's expert's report that two accelerants were used to light the truck fire, where as only Coleman fuel -- which Carr admitted was in the can that, one way or another, made its way up to the porch—

---

[1]   The five volumes of the trial transcript are contained within Volumes I and II of the red bound habeas corpus record, which itself is also five volumes in length.

was used vis-à-vis the porch fire.  Based on the state's laboratory report and the testimony

of Doctor Young, the forensic chemist who conducted the testing of the soil samples, the

soil samples taken from under the truck contained a medium petroleum distillate which

was consistent with Royal Oak charcoal lighter fluid and totally inconsistent with

Coleman fuel. (Trial Tr. Vol. III at 163-66, 173.)  Young also testified that one of Carr's

socks and one glove worn by Carr that night contained a medium petroleum distillate

consistent with Royal Oak.  (Id. at 172- 73.)[2]  In his testimony Young stated that he used

gas chromatography in conducting his tests. (Id. at 160-63.)   On cross-examination

defense counsel, having consulted with a chemist, asked Young if there were other types

of test that were more accurate than the gas chromatography test that he used. (Id. at

176.)  Young replied that that was not really the case, stating that testing by a mass

spectrometer is not really more sensitive than the flamminization detectors, although a

mass spectrometer might have in this case cleared up some of the indeterminate results

and led to identification of individual hydrocarbons.  (Id. at 176, 179-82.)[3]

The prosecution also introduced a can of Royal Oak into evidence.  This can,

according to the law-enforcement responders to the scene, was found on the porch.  (Trial

Tr. Vol. II at 131, 176-77.)[4]   It was photographed by Officer Green and then taken by

---

[2]        Young also stated that a pair of sneakers that were taken from Carr's place of work tested positive
for this type of compound (id. at 174) but it was also Carr's contention that after he left the scene of the
fires he threw the pair of sneaker he wore when he set the truck fire off of a bridge.  A pair of sneakers was
never recovered from these waters. The prosecutor questioned Carr on why he took the officers to his work
site to get a pair of sneakers that he was not wearing that night and Carr gave an evasive reply.  (Trial Tr.
Vol. IV at 198.)  Officer Green of the Brunswick police department testified that the sneakers in the office
when compared to the footprints at the scene had two similar characteristics.  (Trial Tr. Vol. II at 197.)
Neither the prosecution nor the defense relied on the sneakers in their summation.
[3]        During this cross-examination Young also testified that if there was an open container of Coleman
fuel and the fumes of the fuel got into the air and a match was struck it was possible for there to be a little
explosion in the air by the can.  (Id. at 183-84.)
[4]        Mr. Divens testified that there was a can of Royal Oak starter fluid that he had purchased on the
porch. (Trial Tr. Vol. II at 81, 83-84, 86-87.)

Officer Ramsey as evidence.  (Trial Tr. Vol. II at 147-48, 150-55.)[5]  It was tested for fingerprints but no usable prints were found.  (Id. Vol. IV at 38-39, 60.)

       The prosecution had evidence and testimony that the doorway fire blazed long enough to cause charring, that the areas affected included the front of the door and the right side of the doorway, that the wood itself was partly consumed, and that a plastic shovel or rake had melted and bits of it were laying, bubbled next to the door.  (See, e.g., Trial Tr. Vol. II at 99, 131, 204, 205; id. Vol. III at 34, 35, 120, 143; id. Vol. IV at 57-59.)  There was also burning and evidence of accelerants on the bottom side of the porch deck directly under the door threshold.  (Id. Vol. III at 116-17, 145-46.)  Furthermore, Brunswick Detective Goulet, Brunswick Police Commander Bruce Boucher, and the State's fire inspectors Robert Long and Richard Shepard testified that there was potentially an intentional third burn on the box housing the telephone wire to the house, located on the wall at a height about halfway up the doorway.  (Trial Tr. Vol. II at 205; id. Vol. III at. 35, 120, 141, 144-45, 151; id. Vol. IV at 26-29 .)  Robert Long, an investigator from the Office of the State Fire Marshal, indicated that his opinion was that an accelerant had either been poured or thrown on the wall in that area and landed on the box, with no communication between it and the doorway fire.  (Id. Vol. III at 120-21.)  Officer Braley relayed that Carr had indicated to him that morning that the fire was still going when he left because he could not put it out and that he prayed that the fire would go out.  (Id. Vol. II at 217; id. Vol. III at 19.)

       Sent to Carr's Bath residence, Corporeal Mike Lever of the Bath Police Department encountered Carr as he was getting out of his truck. (Trial Tr. Vol. II at 104.)

---

[5]     Defense counsel pressed an unsuccessful argument that the prosecution did not adequately establish a chain of custody apropos the Royal Oak charcoal fluid.  (See, e.g., id. at 150-55, 180-85.)

Lever stated that when he told Carr that the Brunswick police wanted to talk to him and that they were on their way over, Carr offered, without Lever having made any mention of Debbie, that he had not been to Debbie's that night and had not called her.  (Id. at 108.) Lever testified that he was standing by the open driver's side door when he was nudged by Brunswick Police Officer Ramsey (who had just arrived) to draw his attention to the door's built-in open pocket and Lever saw therein about a dozen unlit stick matches about a foot long.  (Id. at 104-07.)  He also noticed a burnt wooden match on the floor of the truck right in front of the driver's seat.  (Id. at 107.)

With respect to the layout of the porch Commander Boucher testified that the porch had a roof and a protective post and railing.  (Id. Vol. III at 36.)  Apropos the tenability of Carr's version of events, one of the investigators from the Office of the State Fire Marshal, Robert Long, who had a yellow lab trained in accelerant detection with him in his investigation, testified that his observations led him to conclude that there were two separate fires with no communication between them.  (Id. at 106-07.)  He reported that there were no burn marks on the deck away from the general area of the door.  (Id. at 112-13.)[6]   Long was asked:

> Q       Now suppose, suppose that somebody had set fire to the truck with
> the use of a Coleman fuel, and while they were setting fire to the truck
> using the Coleman fuel, the fuel can caught on fire, and the person setting
> the fire, to get rid of the can, threw the can over their head, and the can
> landed up on the deck, skidded around.  The person ran up and tried to put
> the fire out, tried to ... kick the Coleman can off the deck, but the Coleman
> can skidded around and poured fuel all over the place.  They finally got
> the can off the deck, and they ran down the stairs and drove off.  Would
> that be consistent or inconsistent with your findings?

---

[6]       Long did not take samples from the stairs, on which his dog had indicated, on the assumption that there had been cross-contamination from other parts of the scene and in view of the expense for each sample.  (Id. at 115.)

A       I guess I would have to say, based on the physical properties of that particular piece of real estate, that it would be almost physically impossible.

Q       Now why would it be almost physically impossible?

A       The back end of the deck where the door of the apartment was located is pretty well separated from where the vehicle was located by both the construction of the porch, it's a fairly lengthy porch, with fairly good set of rails around the upper portion of it, a roof over it, fairly narrow stair opening, and tree branches overhanging almost the entire driveway.

Q       I believe the characterization was impossible?

A       It would certainly be impossible for me to do.  I guess you would have to be a little more athletic and a little more accurate with a throw than I could ever hope to be.

Q       Okay.  Other than the physical construction of the building and the porch area, what in terms of your investigation, your findings in your investigation, would suggest to you that this situation, this hypothetical situation that I propose to you, would be impossible.

A       Number one, the findings of the burn areas or the burn area on the deck would not be consistent with something that had landed and spilled in a container on the deck.  Generally, something such as a can or a Molotov cocktail, or something of that nature thrown will leave a very distinct pattern usually at the point of impact.  There will be a splatter and then it will splatter, usually outward and widen out or narrow out from that point, depending on what type of container it was.

This was a very concentrated area that was involved in this fire and there was no indication, beyond the doorway and the area immediately adjacent to the doorway, that this type of an act had happened.  If a can had landed there from below, stopped right there and emptied itself, it didn't slide the length of the porch.

Q       And the place where it would have had to stop and empty itself is right on the doormat?

A       And the area immediately adjacent to it, including the wall alongside the porch, above the telephone box.

Q       Now, back to our hypothetical.  What would you expect the Coleman can, after it had caught on fire and been kicked around, and assuming that the person who set the vehicle on fire used the word "flash," the Coleman can flashed, caught on fire, and after it got kicked around for a while up on the porch, and then finally kicked down to the ground, what would you expect that Coleman can to look like?

....

A       If burning had actually occurred at the Coleman can, there should be some evidence or indication on the can that it was involved or at least partially involved in a fire.  There should be some scorching present or some indication of heat impingement on the can itself.

(Id. at 123-27.)  Long was asked to examine the can and testified that there was no scorching or burning on the can whatsoever.  (Id. at 127.)  He testified that based on his experience and training the fire on the top of the porch would have been the initial act as there was far more damage to the top of the porch than there was to the truck.  (Id. at 129.)  He described the smaller truck fire as "an afterthought," and said as the fire stayed small there was no actual danger that this fire could block the apartment occupants' egress.  (Id.)

Richard Shepard, another investigator for the State Fire Marshal's Office, articulated his opinion that the fire on the porch started first based on the fact that the person responsible for setting the fire would have had to come past the fire on the vehicle if it was started first and fire starters do not normally block their means of egress when they start a fire.  (Id. Vol. IV at 17-18.)  The prosecutor against posed her hypothetical:

> Q        Suppose hypothetically an individual states that he or she with the intention of setting fire to the automobile pours Coleman fuel in the area of the front of the automobile and lighting the fuel, the can flashes, becomes on fire and in an effort to get rid of the can, the person setting the fire throws the can, the can lands on the deck, the person runs up to the deck, kicks the can around, but the can is spilling fuel out all over the place, the fire is spreading.  They finally get the can kicked off the porch, and they run away.
>
> Is that scenario consistent or inconsistent with your findings?
>
> A        It is very inconsistent with the finding that we had here.
>
> Q        And how is that?
>
> A        Number one, and most notable is the container of Coleman fuel shows no signs of scorching, no signs of burning, no signs of charring.  Number two, it also shows no signs of being dented from being thrown and landing on material and then being kicked, and then off the second floor landing, back down to the ground.
>
> The other thing that would be inconsistent with that is the fire at the vehicle did not start on the ground, it started on the front grill of the vehicle itself.  There was no fire on the ground of the vehicle.
>
> Also, the second floor deck did not have any indications of any burning anywheres except in front of the primary means of egress to Apartment 17C, which was the primary door in and out of the apartment.

The only burning was directly in front of the door.  There were no run stains from the liquid running, there were no other signs of charring or burning or discoloration on the second floor deck.

Q        Is it possible that if the porch was sloped a little bit, some of the Coleman fuel could have run down and pooled in the area of the front door?

A        Are you talking about a slope from the front of the porch to the rear of the porch, from roadside to backside?

Q        Either way.

A        If it had been sloped in that manner, it would have been noticeable in the photographs with any sizeable slope, and we didn't notice that.  If it had been sloped from the outside to the house side, the liquid would not have been able to flow freely there because of the gaps in the planking on the deck.  The planking had air spaces in between the deck, and the liquid would have flowed through the spaces and down onto the ground below.

Q        And did you detect any flammable liquid in the flight path of the Coleman can if the facts had been as stated by our hypothetical fire starter?

A        Through the use of the accelerant detection canine there [was a] potential presence of accelerant on the stairs.  However, we deemed that that was as a result of contamination from walking from the deck down through the stairs.  There wasn't any presence of charring or anything on the deck.  If the container had been burning as in your hypothetical, the product would have been burning and coming out on fire, therefore, sooting, charring.

(Id. at 18-20.)  Defense counsel cross-examined Shepard on the question of

contamination, asking if they could not be sure of the presence of the accelerant on the

stairs and Shepard testified that they determined that there was no significance to it

because there was no burning there.  (Id. at 49-50.)  He indicated that the damage to the

porch was confined to a small area and attributed this to the fire being doused by the

occupants in its "incipient or beginning stage."  (Id. at 55.)  He noted that the trees and

foliage adjacent to the porch deck showed no sign of any burn damage, charring, or other

evidence of burning.  (Id. at 48.)

Shepard also testified that when he executed a search warrant on Carr's truck he

found the gloves but there was no other camping related equipment in the truck.  (Id. at

39-40.)  He also testified that the Coleman can showed no sign of charring and no other sign that it had been exposed to fire.  (Id. at 47.)  He pointed out that the neck was still silver, as opposed to being sooted or charred.  (Id.)

Debbie Divens testified that Carr forbad her from carrying Coleman fuel or kerosene or gasoline in vehicles out of a concern that if they got into an accident it would blow up and that he did not customarily carry 12-inch wooden matches in his car but used such matches only for lighting the fireplace.  (Id. Vol. IV at 66-67, 96.)  She stated that when she discovered the doorway fire (after a smoke detector alerted) there were flames all around the door and they probably reached up as high as her shoulder or maybe a little higher.  (Id. at 75-76.) After she and her parents doused this fire with bowls and pots full of water and a wet towel from the outside closeline they noticed the truck fire and called 911.  (Id. at 76-79.)

### Carr's Testimony

Against co-counsels' advice (see id. at 104 – 07); see also id. at 101-05, at the close of the State's case -- at which point counsel thought they were going to get an acquittal on the attempted murder charges (May 6, 2003, Post-conviction Evidentiary Hearing Tr. at 157) --  Carr insisted on testifying.  He stated that he had been at a local bar until closing sometime around 12:30 a.m. and shortly after he got home he received a phone call from his father-in-law.  (Trial Tr. Vol. IV at 144.)  Carr testified that his father-in-law "threatened" him, telling Carr that he "was gonna go through it all again." (Id. at 144, 150, 153.)

Apropos his state-of-mind as it concerned his prospects for access to his son as a result of the guardian ad litem report and this alleged phone call, Carr's testimony was

15

somewhat confusing.   Carr testified that he was concerned that he was not going to be able to see Denver; he "worried that the stuff that had been happening for the nine months throughout the divorce might possibly start again".  (Id. at 144-45.)  On cross examination Carr stated that he was afraid that his father-in-law would find a way to put him in jail and take his son from him in view of the fact that Carr had the guardian ad litem's permission to be back with his son once his therapist determined he had separated the issues of his wife from his child.  (Id. at 149-50, 153.)  However, he admitted that the report advised that Debbie get custody, suggested that Carr be permitted supervised visitation, and recommended that Debbie be able to relocate to New York.  (Id. at 156.)  He further conceded that in his written statement to the police he stated, "The guardian ad litem report came to my home this week and it guaranteed Debbie to have my son."  (Id. at 156 -57.)  Carr explained that if his in-laws called him and Carr called back he would be violating a protection from abuse order and the Brunswick police would show up and take him to jail and his child would be taken from him.  (Id. at 154.)   Carr stated that he believed that his father-in-law's call was meant to trigger this sequence of events.  (Id.)

Carr relayed that he decided to go drive by his wife's residence to see if his father-in-law's vehicle was in Maine.  (Id. at 145, 148, 154.)   Carr stated that if his father-in-law was in Maine then Carr believed that he was going to continue provoking him until Carr lost his child. (Id.) When Carr got to the residence he noticed that his father-in-law's truck was in the dooryard and his wife's vehicle was not there.  (Id. at 145, 148, 155.)  Upon seeing this Carr concluded two things: his father-in-law was planning on doing something and his wife was off somewhere (as, according to Carr, she would have parked on the

corner if her parents' truck was in the driveway).[7] (Id. at 145-46, 150, 155.) Defense counsel then elicited from Carr that he had given a written statement to the police the morning of the arson and asked if that statement was truthful and accurate.  (Id. at 147-48.)  He did not ask Carr to describe the logistics to the jury, instead concluding his direct examination.

On cross-examination Carr explained how he parked his truck down the street from the house, knowing that he was not supposed to be there, and stood outside his truck crying for a couple of minutes.  (Id. at 157-58.)  Then he started thinking about losing his child and he "didn't know what to do at that point."  (Id. at 158.)  He then wrote a message in the dirt by his in-laws' truck that Carr described as intended for Debbie's father:  "Debbie is a shut (sic) and you know it."  (Id. at 158-59.)  He explained, "[B]ased on information that I had over the total nine months, including that evening, it was quite obvious that my wife was pretty promiscuous, and that that's exactly what she was doing."  (Id. at 159.)  He stated he just wanted his child back but conceded that writing this message was not going to help this cause.  (Id. at 159-60.)  He testified that all he was thinking about at the time was Denver.  (Id. at 160.)  Asked if whether writing the message made it more or less likely that he would be able to see more of Denver, he stated he did not weigh the odds but that he had no intention of getting arrested.  (Id. at 161.)  He allowed, though, that his hopes apropos Denver were destroyed by the fact of his father-in-law's presence in Maine.  (Id. at 161-62.)  Carr then wrote something similar to "Debbie is a slut," on the truck window.  (Id. at 162.)

---

[7]      Debbie Divens testified that Carr was aware that she would leave her vehicle at work and have her parents pick her up when they were visiting and that the morning after a police officer drove her over to her place of employment to get her car.  (Id. Vol. IV at 6-7,81.)

Carr stated that he then went back to his truck where he noticed that he had camping equipment in the back and he "just lost it at that point" because he could not handle thinking that he was not going to see his son again.  (Id. at 163.)  "And so," he testified, "I grabbed what stuff I had there, which happened to be my Coleman fuel and the matches."  (Id.)  He stated that he did not have a plan and that he did not know what he was going to do.  (Id.)  Carr testified that if he had had a sledgehammer or something along that line he probably would have grabbed that; he wanted to go back and make a statement somehow.  (Id. at 163-64.)

Then Carr gave the following testimony:

Q      Okay.  Well so what did you do with the Coleman fuel?
A      I went back and I saw his truck, and I knew that the father's truck was the only thing there that belonged to the father, and I just wanted him to leave and get out of here, leave the State of Maine.
A      Well, did you think that it might be harder for him to leave after you burned his truck?
A      I don't know.  I received numerous threats from him throughout the time that he was coming to Maine.
....
Q      So what did you do with the Coleman fuel?
A      I eventually poured it on the hood of the truck.
Q      And were you wearing gloves at the time?
A      I believe that I had a glove on my left hand.
Q      And you're right handed, aren't you?
A      I'm right-handed.
Q      So how did you pour the Coleman fuel?
A      I had the Coleman Fuel in [my] left hand, and I had the matches in the box in my right hand.
Q      And how much of the Coleman fuel did you pour on the truck?
A      I don't recall how much.
Q      Did you empty the can?
A      No.
Q      And how did you – after you poured the Coleman fuel on the truck, what did you do with the can?
A.      After I poured the Coleman Fuel on the truck,  I lighted it.
Q      Lighted what?
A      The truck.
Q      Okay.  Well, did you put the Coleman fuel down to do that?

18

A      No.

Q      Well, you have got the Coleman fuel –

A      In [my] left hand.

Q      --in your left hand.  How do you light a match with one hand?

A      Not very easy.

Q      So how did you do it?

A      I held onto the can, and I believe I had the other glove with me, and I had the box of matches, which the striker I believe is on the cover, which when you remove the cover, you put it on the bottom.  And so holding the can and holding the matches, I had to take the match and strike it on the striker and then lean over like this and touch the match to the truck.

Q      So is your testimony that you were holding the Coleman fuel can and the matchbox in the same hand.

A      No.  I had the matchbox in my right hand with the matches in the matchbox.

Q      So how did you strike if you had the box and the matches in your right hand?

A      Correct.

Q      How did you strike the match on the matchbox?

A      Because the cover has the striker on it, and I had to take the cover off and strike the match against the cover.

Q      Well, how did you [do] all that with one hand?

A      I did it with both hands.

Q      Did you put the Coleman fuel can down?

A      I never put the Coleman fuel can down.

Q      Did you hold it like this (indicating)?

A      I don't recall if I had a hold of it in my hands.  Right.  And I believe I held my – I believe I put the cover in my left hand.

Q       Well, you know that Coleman fuel is very volatile, don't you?

A      I know the flash point is rather low, yes.

Q      So why didn't you just put the Coleman fuel can down and then have two free hands to light the match?

A      Because I wanted just to leave.

Q      You were in a hurry?

A      Of course.

Q      And you think it would have taken you longer to set the Coleman can down and light the match than it would have been to try to do everything?

A      I don't think I was thinking of anything at that point in time.

Q      Well, you were thinking that you wanted to leave?

A      Correct.

Q      So you held the Coleman fuel in your hand while you lit the match?

A      Yes.

(Id. at 165-68.)  The prosecutor then explored with Carr, without getting an explanation,

why the police did not find the round box and its cover in the truck when they found the

matches in the side pocket, as the police photographs demonstrated.  (Id. at 168-69.)

Next came Carr's description of the flash and the throw:

Q       Okay.  All right.  So you lit the match while you were still holding
the can of Coleman fuel.  And what happened when you lit the match?
A       When I lit the match, I leaned over and put it near the truck.
Q       Yeah.
A       And as soon as the fuel on the truck lit, the whole everything lit.
Q       What do you mean "the whole everything lit"?
A       Everything, the air, everything lit.
Q       Like there was an explosion, kind of?
A       Wasn't like there was an explosion.  It just like it, it just, there was
a flash.
Q       When you touch the burning match to Debbie's father's truck,
which hand did you have the match in?
A       My right hand.
Q       And so you are still holding the Coleman fuel in your left hand?
A       Yes.
Q       And are you holding it down at your side.
A       No, I don't believe so,
Q       How were you holding it?
A       I was holding it up.
Q       Like this (indicating)?
A       I believe I had the glove, the other glove underneath that arm.
Q       Like this (indicting)?
A       Close.
Q       And then you leaned forward and lit the car?
A       Right.
Q       And then what happened?
A       And then it flashed.
Q       Which flashed?
A       The whole area flashed, everything flashed.
Q       Did the Coleman can flash?
A       Everything flashed, the whole—
Q       You didn't flash?
A       It seemed liked I flashed.
Q       Were you injured?
A       Yeah.
Q       How were you injured?
A       I burnt my hand.

Q        Well, in your testimony, excuse me, in your statement, you said this caught fire?

A        No.  In my statement, I said it appeared to be on fire.

Q        Okay.  It appeared to be on fire.  Now, what – upon what do you base your statement that it appeared to be on fire?

A        Because it flashed.

Q        Did you see flames coming from the can?

A        I saw flames coming around my arm and the can and the truck.  This all happened in about a tenth of a second.

Q        So what did you do with the can?

A        I threw it.

Q        And it's in your left hand?

A        It's in my left hand.

Q        You're a right-handed man"

A        I am a right-handed person.

Q        And are you wearing a glove on your left hand?

A        I believe so.

Q        Now, how exactly – why did you throw the can?

A        Because it flashed.

Q        And you wanted to get rid of it?

A        Obviously.

Q        Why not drop it on the ground?

A        It was, it was not something that I decided whether I should drop it on the ground or do what with it.  When it flashed, it was a reaction.  I just threw the can.

Q        You threw the can how?

A        I just threw it like this (indicating).

Q        You threw it over you left shoulder?

A        I threw it with my left hand.

Q        Did you throw it over your left shoulder?

A        I threw it to my left.

Q        You threw it to you left?

A        Right.

 ...

         I didn't throw it directly behind me.  I just threw the can up into the air and the can went up and it landed on the porch.  Are you rebuttling (sic) that or what's going on here?  I don't understand.

Q        What I am just trying to figure out how this happened.

A        Well, If you look at the truck, and you see the wheel well and you put your body facing that, then on the left-hand side of the staircase, and it's just a little bit, oh, about 260 degrees, if my zero is facing the truck.  So that's just back at this angle is the stairwell.  And if I throw something up in the air to the left, it goes toward the stairwell.


(Id. at 169 – 72, 174-75.)


21

Carr then testified that he saw fire on the stairs and he dropped everything, including the gloves and matches, and ran up the stairs to get the can.  (Id. at 175-76.)  He stated that the can was still on fire when he got to the top of the stairs at which point the can was just a little bit away from the top of the stairs where he stood, laying on its side.  (Id. at 176.)  He bent over to pick it up and realized it was on fire and making a hissing noise.  (Id.)  When he tried to pick it up Carr said he burned his hand.  (Id. at 177.)  In an attempt to get the can off the porch he kicked it across the length of the porch (as opposed toward the short end) and it went along the porch towards the back side of the porch and Debbie's door.  (Id.)  It ended up pretty much right in front of Debbie's door.  (Id. at 178-79.)  According to Carr, at this point everywhere Carr looked was on fire and the steps were still burning.  (Id. at 179.)  He says he chased the can at the same time trying to stamp down the little fires that were around him.  (Id.)

The prosecutor queried:

Q     Why didn't you bang on the door and say, "Debbie wake up, call the fire department?
A     Well, first of all, I don't believe Debbie was home.
Q     Why didn't you bang on the door and say, "Mr. Divens, wake up, call the fire department" ?
A     Isn't that obvious why I didn't do that?
Q     Why?
A     Well, first of all, I didn't want to have the cops come and arrest me.
Q     Well, you already told us you weren't thinking about that because you wrote the message in the dirt, and you weren't thinking about consequences.
A     I wasn't thinking about the consequences.  It doesn't mean that I want to – I am gonna stand there and let the police drive up and see me standing there over this message.
Q     Well, didn't you think that the message was rather your signature?
A     No.
Q     So you thought if the police saw that message, they wouldn't automatically connect it to you?
A     Oh, I knew they will connect it to me.

22

> Q       Okay, going back to your attempt to get this burning Coleman fuel
> can off the deck, you have kicked it, it's landed right in front of Debbie's
> door.  What do you do now?
> A       I kept kicking it till it went off the porch.
> Q       And every time you kicked it, it spun a little bit?
> A       I don't recall exactly what it did.  I know that there was a bunch of
> stuff in the way, and I was trying to get it off the porch, and the only way
> to get it off was to kick it off.
> Q       'cuz the container was too hot?
> A       Absolutely.

(Id. at 179-80.)  Carr said that when he finally kicked the can off the porch it went off the

back, narrow end adjacent to Debbie's door. (Id. at 182.)

He testified that he then looked and looked and saw that the can was still on fire

on the ground so he ran down to get the can.  (Id. at 183.)  There he grabbed some paper

out of a box under the porch as well as some dirt and some leaves and piled these

materials on the can until he got the fire out.  (Id.)  He then picked up the can with the

newspapers and then went and picked up the stuff in front of the truck and left.  (Id. at

184.)  At this juncture he looked up to the porch and all he saw was smoke; he did not see

any fire or any big flames.  (Id.)  When asked whether in his statement he wrote, " I cried

all the way home and prayed the fire would go out," Carr replied that he was referring to

the truck fire which he believed was still burning.  (Id.)  The prosecutor asked:

> Q:      Well, why did you pray that fire would go out?
> A       Why did I pray the fire would go out?
> Q       Right.
> A       It's pretty obvious, isn't it?
> Q       No.
> A       Fire's not a good thing to have.
> Q       But I mean, you deliberately set that fire.  You wanted that fire.
> A       No, I didn't want that fire.
> Q       You didn't want that fire?
> A       No.
> Q       If you didn't want it, why did you set it.

A       If, like I said, if I had had something else, if I had a crowbar, I probably would have busted the windows that night.

Q       Well, you didn't have a crowbar, you had Coleman fuel.

A       Correct.

Q       You intentionally set that fire on the truck?

A       Correct.

Q       So you wanted that fire on the truck?

A       No, I wanted the truck damaged.  I didn't necessarily have any fascination with the fact that the truck was on fire.

Q       Well, didn't you think if the fire didn't go out, that the fire continued to burn, that then the truck would be even more damaged then it already was?

A       Yes.

....

Q       When you left [Debbie's apartment], you say that you collected the can and you collected the gloves in front of the truck.  And did you collect the burnt matches, too?

A       I just grabbed everything I saw.

Q       Why did you do that?

A       What do you mean why did I do it?

Q       Why did you do it?  Why didn't you just leave everything there?

A       Why would I leave everything there?

Q       Well, I am asking you why you took the things.

A       I took the things 'cuz they belonged to me.  I took the things because I didn't want anybody to know that I was at her house.

Q       Because this would get you in trouble?

A       Because that would ultimately end up with me not being able to be with my son.

Q       When you left, was the fire still going on at the house?

A       I don't believe so.

Q       But you know that the [fire] was still going on at the truck.

A       Yes.

(Id. at 184-86, 189-90.)   Asked whether he was concerned whether the fire on the truck which was still going on when he left might ignite the stairs, Carr testified that he was concerned that the porch fire might reflash and that people could get hurt.  (Id. at 190-91.)

The prosecutor then explored Carr's failure to do anything to alert the residents to the danger caused by his message sending gone awry:

Q      So did you stop at a pay phone and call the fire department?
A      In my statement that you have read, my intention was to go home and call her house from my home.
Q      Well, didn't you think that was kind of risky waiting until you go all the way home to call the fire department?
A      I wasn't gonna call the fire department.  I was going to call my wife's house.
Q      So you were gonna call then and tell them?
A      I wasn't gonna tell them.  I was gonna call them until someone answered the phone.
Q      And then do what?
A      And then hang up.
Q      So your intent would be to wake them up so she could get out of the house in time?
A      No.  There wasn't any intent to wake up so they could get out of the house in time.  The fire wasn't burning on the porch when I left.
Q      So why were you gonna call them then when you got home?
A      Because I was concerned with the fact that the porch may have a reflash.
Q      So you were gonna call them when you got home to warn them that the porch might have a reflash?
A      Right.
Q      Why not just bang on their door right before you ran off?
A      I made quite a bit of noise while I was there.
Q      Mr. Carr, you don't think that waiting until you got home to call put them under some unnecessary risk?
A      I didn't say that.
Q      Well, do you think that it put them under some unnecessary risk by waiting until you got home to Bath before you alerted them that there might be this fire out on the deck?
A      Do I think that now?
Q      Yeah.
A      Yeah.
Q      Did you think that then?
A      No.

(Id. at 191-92.)  Carr stated that when he arrived home he was met by a police officer and

Carr testified that he tried to tell the officer that he needed to go into the house to make a

phone call.  (Id. at 194.)  Yet he also stated that when the police officer pulled up behind

him he immediately told Carr that there was an incident in Brunswick and that the

Brunswick police wanted to speak to him so it was "pretty obvious" that he had been

caught.  (Id. at 194-95.)  Carr also tried to suggest that the initial denial of his

involvement in the Brunswick events during questioning by the police were not lies; he

was only giving narrow answers to questions such as, "Have you seen your wife

tonight?"  (Id. at 196 -97.)  He contended that they never asked whether he had been at

the apartment in Brunswick and he never disclaimed that he had been.  (Id. at 195-97.)

Carr testified that he had no big goal or plan that morning; that he just wanted to

let Mr. Divens know that Carr was through with him and his daughter's efforts to take his

son from him.  (Id. at 186.)  He stated that at that point he was convinced that they were

going to take his son from him and there was nothing he could do beyond going over

there and leaving a statement.  (Id. at 187.)  Carr believed that he lost his son because of

Debbie, his father-in-law, the guardian ad litem, Debbie's adversarial lawyer, and Maine's

protection from abuse laws, which all worked against him.  (Id. at 188.)  He also testified

that his custody situation was not attributable to his own conduct.  (Id.)  Carr further

indicated that, while he preferred not to leave open containers of flammable liquids in his

vehicles, having moved from a large to a small apartment he did not have sufficient

storage space and so he took to storing things including Coleman fuel, oil, transmission

fluid, and the like in the back of his truck.  (Id. at 131-32, 135.)  He explained that, while

he had not gone camping the weekend before, he was planning on going camping on a

long weekend the upcoming weekend.  (Id. at 132.)  According to Carr in the back of his

truck that night he had a Coleman stove, a cast-iron stove, long stick matches, his leather

woodstove gloves that he used with his smoker when camping, a toolbox, and a come-a-

long.  (Id. at 133, 136.)

### *The Prosecutors' Closing*

The prosecutor theorized that Carr was in such a state of distress over the prospect of losing his son that he preferred that his son and Debbie Divens were dead. (Trial Tr. Vol. V at 10.) The prosecution argued in closing that Carr -- who had just received a report from a guardian ad litem working on custody recommendations apropos Denver that boded ill for his prospect with his son --  picked up the Coleman fuel and some long fireplace lighting matches from his Bath, Maine home and drove to Debbie Divens's Brunswick apartment.  (Id. at 8-10.)   After writing two separate statements, one on the truck and one on the dirt surrounding the truck:

> He takes the Coleman fuel, he walks up the stairs, pours the fuel on the welcome mat right in front of the door, take the can and splashes it on the telephone box to make sure that[,] in the event they do wake up, they are not able to call for help.  He then notices the Red (sic) Oak on the floor. ... The charcoal lighter fluid, he notices that, and he decides that he is gonna set the car on fire, too, and he sets the car on fire for two reasons: One, so in the event they do get out of the house, are not able to escape in the car.  And secondly, by setting the car on fire at the very bottom of the stairs, if they did manage to get out of the house, then their escape would be blocked by the fire, which is right near the stairs.  Maybe the stairs would be on fire then, too.
> So he takes the charcoal lighter fluid, he goes downstairs, and he squirts it in the front of the grill.  He then brings the charcoal lighter back upstairs, lights the house, runs down the stairs, lights the car, and takes off.

(Id. at 11-12.)   The prosecutor later explained that even on Carr's own version of events, in which he said he intended to, but did not in fact, call emergency services after leaving the scene, "he was willing to risk the death of his son, by, in his words, accidentally starting a fire up on the deck and just leaving and being more concerned with destroying the evidence ... than maybe getting someone over there to put that fire out so his son wouldn't die."  (Id. at 12-13.)

She continued:

27

You saw the photographs, and you have seen the video, and you know that with the way the defendant describes this Coleman can run a[]muck is, in the words of Richard Long, impossible, impossible. He says – he says that he takes the Coleman can in his left hand, and he is wearing a glove, and he has these long matches, and he has the container that these matches are in, and he is holding the can like this (indicating), and he like somehow gets one of these matches lit. And when I asked him, I said, well, Gee, when you are ready to set the fire to the car, why don't you just put the Coleman can down? ["]I was in a hurry.["] That's not how it happened. Nobody, nobody can accomplish what he said that he did.

Secondly, if it had happened that way and he was standing at the side of the car, which is inconsistent with the scientific evidence that the burning was at the front of the car and not the side, but if he was standing at the side of the car like he said, and he threw it to his left, the can would bounce on the wall of the house directly behind him. And that didn't happen. I mean, this is the area he says he is standing in (indicating). If he threw that, if he is facing the car and he threw it to his left, it's gonna land right in here. But he is saying that it somehow miraculously flew up a flight of stairs, landed on the deck, skidded around, and was firing all over the place. Well, there is a slight problem with that, a slight scientific evidentiary problem. And that problem is that there was no fuel anywhere on the porch except right in front of the house. And there was no burning anywhere on that porch ... except right in front of the door. And if you look at these photographs, and all these photographs are in evidence, I mean, he is saying that he kicked it through this thing, this little space off the back end. Do you think that's possible, even remotely? And the can itself is totally devoid of any kind, any kind of corroboration of this fantasy. It's not burned. It's not dented. It's not kicked. It's not scorched.

(Id. at 17-18.)

### *Disposition of Ineffective Assistance Claims*

Strickland counsels that in making a determination of whether or not there is prejudice the court "must consider the totality of the evidence before the ... jury." 466 U.S. at 695.; Smith v. Dretke, __ F.3d __, __, 2005 WL 1625003, *4 (5th Cir. July 12, 2005) (noting that the court must look at the totality of the evidence and determine the extent to which counsel's errors hurt the defendant). With respect to the argument that counsel should have filed a motion to suppress based on spoliation of the evidence, post-

conviction counsel's main argument in seeking the Maine Law Court's review was that

had an expert been able to test the samples taken then the defense might have raised a

doubt concerning the prosecution's theory that Carr used Royal Oak as a second

accelerant on the truck.  However, if you read the transcript of the trial, some of which is

excerpted above, the post-conviction court's prejudice conclusion is certainly not

assailable when viewed through the 28 U.S.C. § 2254(d)/<u>Strickland</u> prism.  By the time

that Attorney Bushell commenced representing Carr on December 13, 1995, the thirty

days prior disposal of samples deadline warned of in the August 10, 1995, Young reports

(not to mention the window starting from their collection in July 1995 for independent

testing of the samples while the accelerants were still detectable) had long passed.

Even assuming that such a motion could have been successful and it was

ineffective assistance not to pursue one, and even if counsel should have hired an

expert(s) other than Dodge that would have been able to demonstrate that, although the

defense was unable to independently test the sample, Young's methods were not the best,

 the only dent in the State's case would have been to its theory that Carr, having soaked

the front doorway and telephone box with Coleman fuel (as Carr did not dispute that

Coleman was the accelerant involved vis-à-vis the porch fire), grabbed the Royal Oak,

ran down and poured it and more Coleman fluid on the truck, and than replaced it on the

porch before lighting the two fires.   Under the totality of the circumstances such efforts

would not have influenced the outcome of the attempted murder counts in light of Carr's

dubious rendition of events and his testimony on this score.  Carr makes no claim that an

investigator or an expert could have rebutted the State's evidence that there was no other

indication of burning on the porch stairs to corroborate Carr's claim as to the travel of the

Coleman can.  The alleged use of the Royal Oak accelerant on the truck, according to the prosecution's own witnesses, did not make that fire into the focal point of the attempted murder charges.  The focal point of the prosecution's proof apropos the attempted murder charges was the extent of the fire to the entrance way and the fact that it was confined to the doorway.  The jury's verdict, returned after it had deliberated approximately three hours, must have turned on whether or not they believed Carr's message sending gone-awry story about how the Coleman fuel and flames arrived at Debbie's doorsteps or the prosecution's version of intentional arson. [8]

In his petition to the Law Court seeking review of the post-conviction court's determination, counsel also argued that a motion should have been brought to suppress a crime scene video taken during the canine's accelerant detection.  At the post-conviction evidentiary hearing counsel presented the testimony of an expert in fire scene investigations, Barry Norris who testified that in his opinion the video shown at trial of the accelerant-detection canine demonstrated that the handler had led the dog in such a way that it was following its handler's footsteps and that there was a gap in the tape between when the dog was on the ground and when it next appeared on the second-story porch. (Post-Conviction Evidentiary Hearing Tr. at 88-89, 99-119.)   The post-conviction court concluded that even without this video there was ample evidence of Carr's guilt.   I reach the same 28 U.S.C. § 2254 conclusion apropos this Strickland prejudice determination as I do vis-à-vis the Royal Oak related suppression concern: the post-

---

[8]     In some ways it is easier to believe that Carr lit the doorway fire first then lit the truck fire and left than to believe that after saturating the doorway with Coleman he grabbed the Royal Oak ran downstairs and put it and the Coleman fuel on the truck hood and then went to the trouble of replacing the Royal Oak where it would be found (whereas he took all the other evidence with him).

conviction court's application of the second ineffective assistance of counsel prong was neither contrary to nor an unreasonable application of <u>Strickland</u>.[9]

As for the post-conviction court's conclusion concerning counsel's failure to object to the prosecutor's histrionics, it is obvious that counsel's failure to make such objections does not undermine confidence in the outcome of his trial, <u>Strickland</u>, 466 U.S. at 694, given the strength of the State's case and the quality of Carr's own testimony.[10]  Indeed, it would have to be an extraordinary case of prosecutorial dramatics and defense attorney lassitude to meet <u>Strickland</u>'s second prong on such a claim standing alone.

And with respect to any notion that these claims are part of a cumulative ineffective assistance of counsel claim, my review of Carr's trial attorneys' post-conviction testimony  -- their work with Carr who was a difficult client, their efforts to develop a defense that would work in view of Carr's written confession, their decisions vis-à-vis pretrial motions, their concern about hiring an independent expert, and their ability to keep out a significant amount of detrimental evidence concerning, for instance,

---

[9]        Norris also testified that the telephone wire that was burned on the morning of the fire actually was able to conduct.  He also indicated by reference to the video that the fire in the doorway was not that far along when it was doused by the occupants of the apartment.  However, the evidence apropos the telephone box and the doorway damage was relevant to what Carr attempted to do not what he was able to achieve.  The jury had to chose between his version of an accident and the prosecution's version of deliberate, life-threatening arson (which did not include the need to prove that he was competent as an arsonist).

[10]        Carr directs the Court's attention to <u>Rivera Alicea v. United States</u>, 404 F.3d 1 (1st Cir. 2005).  In that case the First Circuit determined that the District Court erred in not conducting an evidentiary hearing on the 28 U.S.C. § 2255 movant's ineffective assistance claim predicated on counsel's failure to investigate a co-defendant's pre-trial statements that he intended to lie about Rivera Alicia's involvement in the drug conspiracy or, at least, to interview two potentially crucial witnesses.  <u>Id.</u> at 3-4.  If Carr's  case was a 28 U.S.C. § 2255 motion as opposed to a 28 U.S.C. § 2254 petition, the standards for an evidentiary hearing would be different.  <u>However</u>, the standards that apply to federal § 2254 review of state court convictions, set forth above, are, to put it mildly, constrained, <u>see</u> § 2254(d), factual determinations made by the state court are presumed correct, <u>see</u> § 2254(e)(1) and the availability of evidentiary hearings in the federal forum on factual issues not developed in the state court is limited to a narrow category of claims, <u>see</u> § 2254(e)(2).

Carr's stalking of his wife in the nine-month period prior to the fires, his violation of the

protection from abuse order, and the opinions of his co-workers that he was the kind of

guy they considered likely to "go postal" – dissuades me from even discussing whether

Carr meets either prong of the 28 U.S.C. § 2254(d) Strickland showing beyond stating

that he does not.

### *Non-retroactivity of Blakely v. Washington*

Pursuant to 28 U.S.C. § 2254(b)(2) I conclude that Carr is not entitled to § 2254

relief with respect to his unexhausted Blakely v. Washington, 542 U.S. __,124 S.Ct.

2531(2004) claim because it is not retroactive to cases on collateral review. See Schardt

v. Payne, __ F.3d __, __, 2005 WL 1593468, *11 (9th Cir. Jul. 8, 2005) ("We also hold

that the Supreme Court announced a new rule in Blakely v. Washington that does not

apply retroactively to a conviction that was final before that decision was announced.");

Gerrish v. United States, 353 F.Supp.2d 95, 96 (D. Me. 2005) (concluding that Blakely

and United States v. Booker, --- U.S. ----, 125 S.Ct. 738 (2005) are not retroactively

applicable); Orchard v. United States, 332 F.Supp.2d 275, 277 (D. Me. 2004) (concluding

that Blakely is not retroactive to cases on collateral review).

### *Conclusion*

For the reasons stated above, I recommend that the Court **DENY** Carr 28 U.S.C.

§ 2254 relief.

### NOTICE

A party may file objections to those specified portions of a
magistrate judge's report or proposed findings or recommended decisions
entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by
the district court is sought, together with a supporting memorandum,
within ten (10) days of being served with a copy thereof.  A responsive

memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated July 26, 2005.